IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

PATRICIA MILLIKEN,                    )        Case No.  08 C 50144
                                      )
                     Plaintiff,       )
          vs.                         )
                                      )        Magistrate Judge
                                      )        P. Michael Mahoney
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
                     Defendant.       )
                                      )

## MEMORANDUM OPINION AND ORDER

### I.        Introduction

Patricia Milliken seeks judicial review of the Social Security Administration

Commissioner's decision to deny her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act.  *See* 42 U.S.C. § 405(g).  This matter is before the

Magistrate Judge pursuant to the consent of both parties, filed on September 30, 2008.  *See* 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.

### II.       Administrative Proceedings

Claimant first filed for DIB on or about July 13, 2005.  (Tr. 55.)  She alleges a disability

onset date of December 28, 1996.  (Tr. 55.)  Claimant's last date insured for DIB was March 31,

2002.  (Tr. 153.)  Her claim was denied initially and on reconsideration.  (Tr. 76–79.)  The

Administrative Law Judge ("ALJ") conducted a hearing into Claimant's application for benefits

on August 13, 2007.  (Tr. 4.)  At the hearing, Claimant was represented by counsel and testified.

(Tr. 6–36.)  Claimant's daughter also testified at the hearing.  (Tr. 36–42.)  A medical examiner,

Joseph Cools, and a vocational expert, Susan Entenberg, also testified at the hearing. (Tr. 42–54.) The ALJ issued a written decision denying Claimant's application on March 28, 2008, finding that jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. 59–66.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner. (Tr. 539–41.)

III.    **Background**

Claimant was born on March 3, 1950, making her 57 years old at the time of her hearing and 52 years old on her date last insured. (Tr. 7, 10.) She graduated high school. (Tr. 10.) From 1981 to 1996, Claimant worked on the assembly line at Philips Electronics. (Tr. 11, 160, 199–201.) Claimant testified that she would stand about half the day when she worked on the assembly line. (Tr. 12.) She constantly used her hands. (Tr. 18.) Occasionally, she would have to do packing for the company. (Tr. 12.) Claimant testified that as a packer, she would have to lift up to 20 pounds at a time. (Tr. 12.)

Around March 2002, Claimant's daughter was put on bed rest due to complications in her pregnancy. According to Claimant's testimony, Claimant's condition made it difficult to help her daughter during this period. (Tr. 14.) She testified that she had problems doing things with her hands because they would go numb and stiff. (Tr. 14.)

Claimant also testified that she has been "tired all the time" for the past ten years. (Tr. 15.) Her condition affects her ability to babysit her grandchildren. (Tr. 21.) Claimant testified that she can "keep an eye on them," but cannot do any lifting. (Tr. 21.)

Claimant testified that she does the dishes during the day, but has to take breaks to sit

down because her legs "feel like they're going to give out." (Tr. 25.) She testified that she watches television and reads, but that reading is hard because of her eye problems. (Tr. 25.) She testified that her eyes pull to the side and "bounc[e] up and down." (Tr. 25.) She also has a hard time comprehending books. (Tr. 30.) Claimant cooks light meals once or twice a week, cleans the bathroom on rare occasion, dusts once a week, and does laundry every other day. (Tr. 26.) Claimant testified that she can do laundry because she is able to sit while she is doing it. (Tr. 26–27.)

About once per week, Claimant visits with friends. (Tr. 31.) They will sometimes go to the fitness center, where Claimant enjoys being in the pool. (Tr. 31.) She testified that the pool helps her condition. (Tr. 31.) She also testified that she does not go out as often when it is really hot outside because the heat makes her sick. (Tr. 31.) She stated that she has had a problem with the heat since 2005. (Tr. 32.)

Claimant stated that she is able to drive, but avoids heavy traffic. (Tr. 34.) She also has an easier time driving in the summer time than during the winter. (Tr. 34.)

## IV.    Medical Evidence

Claimant's relevant medical history begins on May 23, 1995 when she visited Dr. Donovan at Rockford Memorial Hospital for a physical. (Tr. 500.) At that time, Claimant had some leg numbness and pain. (Tr. 500.) Dr. Donovan attributed the numbness to an injury that occurred when a big dog hit Claimant a year prior. (Tr. 500.) He thought the pain to be related to sciatica.[1] (Tr. 500.)

---

[1]Sciatica is defined as, "Pain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction (hence the term), but now known to usually be due to herniated lumbar disk compressing a nerve root[.]" *Stedman's*

On August 31, 1995, Claimant saw Dr. Maynard at the Monroe Clinic after Dr. Donovan was unsuccessful at treating her leg pain. (Tr. 522.) She complained that her feet were numb and tingled, and that her legs had been giving out on her since the end of March 1995. (Tr. 522.) Claimant indicated that stress caused her legs to give out. (Tr. 522.) She also complained of being tired. (Tr. 522.) He started her on Pamelor, an antidepressant. (Tr. 521.)

Claimant returned to Dr. Maynard on October 10, 1995. (Tr. 520.) At that time, she complained of low back pain which went into her legs. (Tr. 520.) Claimant told Dr. Maynard that she had not yet tried the Pamelor. (Tr. 520.) Dr. Maynard wrote that Claimant had "alpha/delta intrusions on sleep study, consistent with fibromyalgia type symptomatology." (Tr. 520.)

On November 8, 1996, Claimant returned to see Dr. Donovan. (Tr. 501.) Claimant told Dr. Donovan that she had aches, pains, and numbness in her lower extremities. (Tr. 501.) She also told Dr. Donovan that she had poor sleep habits and woke up achy. (Tr. 501.) Claimant expressed hesitance at trying an antidepressant for sleep at night, but Dr. Donovan prescribed her the antidepressant Doxepin. (Tr. 501.) Claimant saw Dr. Donovan on November 19, 1996, at which time he discussed her depression and continued Doxepin. (Tr. 501.) He also noted that she complained of neck aches and pains. (Tr. 501.)

Dr. Donovan referred Claimant to Dr. Shah for a neurological consultation, which took place on April 15, 1997. (Tr. 503.) Claimant complained that she got pain between her shoulder blades which climbed up to her neck and then went into the left side of her head. (Tr. 503.) She also complained of an "electric-like sensation" that went into her head, and intermittent tingling

_____

*Medical Dictionary* 1730 (28th ed. 2006).

4

and numbness starting from her feet up to her waist.  (Tr. 503.)  She also stated that she got foot drop on her left side.  (Tr. 503.)  Advil was the only medication that she acknowledged taking.  (Tr. 503.)

An MRI showed changes in brain white matter, and Dr. Shah found that Claimant's symptoms indicated possible multiple sclerosis ("MS") and possible transient ischemic attacks.  (Tr. 503.)  He also found that Claimant had headaches and musculoskeletal pain.  (Tr. 503.)  He noted that she complained of being nervous and anxious.  (Tr. 503.)  He prescribed her Paxil, which is an antidepressant and anti-anxiety medication.  (Tr. 503.)

On June 17, 1997, Claimant saw Dr. Srivastava seeking a second opinion regarding the numbness and tingling sensations in her lower extremities, and her difficulty walking.  (Tr. 296.)  She stated that she was not taking any medication at that time.  (Tr. 297.)  Dr. Srivastava noted that Claimant's sense of position and vibration was somewhat impaired in the lower extremity, and that heel-knee ataxia was present, especially on the left side.  (Tr. 297.)  He noted the presence of mild ataxia and subjective paresthesia with questionable posterior column involvement, and suggested that Claimant undergo an MRI of her spine.  (Tr. 297.)  She did, and on June 22, 1997, Dr. Srivastava noted that Claimant's MRI showed a protruded disc at C5–C6.  (Tr. 298.)  It also showed bony spur at T6–T7–T8–T9 with "some degeneration of the spine disc spines."  (Tr. 298.)  Bony spurs were also found at L3–L4 and L4–L5, with the most at L4–L5.  (Tr. 298.)

Dr. Srivastava continued to treat Claimant for subjective paresthesia and gait difficulty, and prescribed her Zenoflex on July 22, 1997 to treat her spasms and cramps in her lower extremities.  (Tr. 299.)  On August 12, 1997, Claimant told Dr. Srivastava that she was still

taking Zenoflex, along with Relafen, a drug used to treat arthritis.  (Tr. 300.)  She reported that the pain in her upper extremities had improved, but that she still had some "vague symptoms of lower extremities associated with some 'popping sensation' and being somewhat nervous."  (Tr. 300.)  Her gait was markedly better and her overall condition had improved.  (Tr. 300.)  Dr. Srivastava felt that her symptoms might have been anxiety induced, so he discontinued her Zenoflex prescription and prescribed her Paxil.  (Tr. 300.)  By September 9, 1997, Claimant reported that her symptoms were somewhat better than before, but that she felt tired and fatigued.  (Tr. 300.)

Dr. Srivastava referred Claimant to a rheumatologist at the Freeport Clinic, Dr. Singh, who examined her on November 13, 1997.  (Tr. 303.)  Claimant reported numbness and tingling in both her legs, and difficulty walking.  (Tr. 303.)  She stated that if she sat down, the numbness and tingling in her feet went away, but if she walked, it got worse.  (Tr. 304.)  She also reported that she occasionally experienced numbness in her hands.  (Tr. 304.)  She had some pain in her neck going down her upper back when she flexed her neck.  (Tr. 304.)  Also, her joints popped and cracked.  (Tr. 304.)  She reported not sleeping well. (Tr. 304.)

Dr. Singh noted that Claimant was tired looking.  (Tr. 304.)  He found that her neck movements were limited at extremes due to tightness.  (Tr. 304.)  He also found that she had diminished vibration sense up to the knees and that she had a questionable Romberg test.[2]  (Tr. 305.)  He noted that Claimant had some difficulty in doing heel to toe testing on both sides.  (Tr. 305.)  Claimant had follow-up exams with Dr. Singh on November 18 and December 18, 1997.

---

[2]The Romberg test is a neurological test to detect poor balance.  *Romberg Test*, http://www.mult-sclerosis.org/RombergTest.html (last visited Oct. 22, 2009).

(Tr. 306–07.)  Her symptoms remained essentially the same.  (Tr. 306–07.)

Claimant underwent a comprehensive evaluation at the Mayo Clinic from November 29, 1999 to December 3, 1999, which consisted of exams by multiple doctors.  (Tr. 212.)  Dr. Kennedy, an endocrinologist, found that Claimant was experiencing right shoulder and back pain.  (Tr. 225.)  He noted symptoms of a possible peripheral neuropathy because of the numbness in her feet bilaterally.  (Tr. 226.)  He stated that the symptoms did not sound like typical MS.  (Tr. 226.)  He wrote that Claimant's symptoms sounded more musculoskeletal in nature than anything else, with the exception of the radiation of pain down the arm.  (Tr. 226.)  He also noted that Dr. Oh of the Mayo Clinic's Department of Physical Medicine and Rehabilitation felt that Claimant had multifactorial myofascial pain, right shoulder arm and axial low-back pain, and complicating factors of psychosocial issues in addition to deconditioning.  (Tr. 218.)

Dr. Daube, a neurologist also at the Mayo Clinic, found "mild sensory deficit that appear[ed] to be in the distribution of the S1 sensory root."  (Tr. 220.)  Reflexes were minimally reduced bilaterally, and she had pain with straight leg raising.  (Tr. 220.)  Dr. Daube wrote that Claimant had "significant pain and tenderness over her cervical paraspinal muscles, particularly on the right."  (Tr. 220.)  She also had sharp pain with deep palpation over the trapezius muscle on the right.  (Tr. 220.)  Claimant had "some pain over the lumber spine area as well as the paraspinal and gluteus on the left."  (Tr. 220.)  Dr. Daube concluded that Claimant's primary problem was that of a musculoskeletal pain syndrome.  (Tr. 220.)  He diagnosed her with possible residuals of mild old left S1 radiculopathy, and asymptomatic demyelinating disease of the central nervous system.  (Tr. 221.)  He found no evidence of either active or residuals of MS.

(Tr. 220.)

Dr. Rasmussen, a psychiatrist at the Mayo Clinic, examined Claimant and diagnosed her

with chronic moderate depression.  (Tr. 222.)  He wrote that she had a fairly depressed mood,

some anhedonia, suicidal ideation (although she was not actively suicidal), fatigue, trouble

concentrating, and increased appetite.  (Tr. 221.)  He prescribed her Serzone.  (Tr. 222.)  He

noted that her GAF score was 45, and that her best GAF score last year was 50.[3]  (Tr. 222.)

Claimant saw a nurse practitioner on March 8, 2000 at the Freeport Health Network, Ms.

Blair, who wrote that Claimant had some tenderness of the upper posterior right shoulder, and

discomfort with abduction of the right shoulder.  (Tr. 349.)  Ms. Blair also noted that Claimant

had chronic pain of the upper back and depression.  (Tr. 349.)  She weaned Claimant off Serzone

and started her on Paxil.  (Tr. 349.)  She also instructed Claimant to do physical therapy.  (Tr.

349.)  In April 2000, Claimant told Ms. Blair that the Paxil was working, but that physical

therapy had not helped her shoulder.  (Tr. 350.)

Claimant began seeing Dr. Woiteshek, an orthopedist at the Freeport Clinic, on April 10,

2000 for her pain.  (Tr. 308.)  He remarked that she "look[ed] like she [had] . . . a right cervical

radiculopathy," and that it was getting worse.  (Tr. 308.)  On June 26, 2000, Dr. Woiteshek

administered Cortisone injections in Claimant's trigger point and prescribed her Celebrex, an

---

[3] The GAF score represents "the clinician's judgment of the individual's overall level of
functioning."  Am. Psychiatric Assc., *Diagnostic and Statistical Manual of Mental Disorders IV,
Text Revision* 32 (4th ed. 2000) (hereinafter DSM-IV).  In assessing a GAF score, the doctor is to
consider psychological, social, and occupational functioning, and to rate the patient on a scale
from 0 to 100.  *Id*. at 34.  The higher the number, the higher the level of functioning.  *Id*.
    The DSM-IV describes a patient with a GAF score in the range of 41–50 as having
"[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR
any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to
keep a job)."  *Id.*

anti-inflammatory. (Tr. 310.) On July 27, 2000, Claimant reported to Dr. Woiteshek that her neck was feeling a little bit better. (Tr. 311.) He continued her Celebrex prescription. (Tr. 311.) On September 26, 2000, Claimant told Dr. Woiteshek that she still had numbness in her leg. (Tr. 313.) The doctor noted that an EMG done at the Mayo Clinic read positive for neuropathy. (Tr. 313.)

On January 1, 2002, Claimant saw Dr. Perry at the Monroe Clinic seeking a second opinion regarding her leg and foot numbness. (Tr. 517.) She told Dr. Perry that the numbness had started in 1995 and had gotten worse, particularly during the previous month. (Tr. 517.) After an examination, Dr. Perry described Claimant as having right foot Babinski. (Tr. 518.) Dr. Perry wrote that Claimant's right leg appeared mildly spastic, and that a differential diagnosis would include a thoracic or cervical lesion. (Tr. 518.) He also noted that Claimant had decreased vibratory sense in her legs. (Tr. 519.)

On March 8, 2002, Claimant began seeing a nurse practitioner, Ms. Jordan, at the Freeport Health Network primarily for a rash. (Tr. 355.) Ms. Jordan noted that Claimant had a history of diet controlled diabetes. (Tr. 356.) Claimant returned to Ms. Jordan on August 28, 2002, and admitted to not having been very compliant with her prescribed diet over the past few months. (Tr. 357.) Claimant indicated that she had numbness in her feet and migratory muscle aches. (Tr. 357.) Ms. Jordan also noted that Claimant was diagnosed with "myofascial fasciitis up at [the] Mayo [Clinic] a few years ago." (Tr. 357.) On September 23, 2002, Claimant saw Ms. Jordan for a follow-up, at which time Ms. Jordan noted that Claimant had been diagnosed in the past as having either fibromyalgia or myofascial syndrome. (Tr. 359.) Claimant stated that she continued to experience numbness and tingling in her feet and fingers. (Tr. 359.) Ms.

Jordan assessed Claimant as having fibromyalgia, although it does not appear as though Ms. Jordan tested Claimant's trigger points. (Tr. 359.)

On February 17, 2004, Claimant went to Rockford Memorial Hospital and saw Dr. Gahl regarding her back and leg pain. (Tr. 255.) Dr. Gahl determined that her pain was possibly due to radiculopathy or irritability of the nerves within the spine. (Tr. 255.) He also thought that the pain could be from myofascial problems. (Tr. 255.) He further noted that she had hot spots below the area in the lumbar fascia region showing ligament strain. (Tr. 256.) Dr. Gahl administered epidural blocks. (Tr. 256.) On February 24, 2004, Claimant returned to Dr. Gahl, whereupon he determined her main problem to be low back pain. (Tr. 246.) He gave her another round of epidural blocks and trigger point injections. (Tr. 246.) By March 9, 2004, Claimant reported to Dr. Gahl that her pain was tolerable. (Tr. 243.) Dr. Gahl decided to forgo the third and final round of epidural blocks scheduled for that day. (Tr. 243.)

Around February 2005, Claimant began getting more "wobbly" and started shuffling. (Tr. 228.) In May 2005, she woke up in the night, after exercising during the day, with a headache, neck pain, and vertigo. (Tr. 228.) In July 2005, Claimant returned to the Mayo Clinic without an appointment. (Tr. 273.) After a series of exams, Claimant was referred to the MS clinic, where Dr. Kantarci diagnosed Claimant as having had a probable MS exacerbation and demyelinating myelopathy.[4] (Tr. 229.) He noted that she may have had asymptomatic MS for years, which had just recently begun acting up. (Tr. 229.) Spinal tap results were consistent with MS. (Tr. 227.)

---

[4]Myelopathy is a disorder of the spinal cord or a disease of the myelopoietic tissues. *Stedmans*, *supra* note 1, at 1270.

After the exacerbation in 2005, Claimant testified that she began using a cane.  (Tr. 19.)
She also testified that she tried Paxil in the past for a short time, but did not begin taking
antidepressant medication until 2005.  (Tr. 23.)  She stated that she began taking the medications
because she was experiencing mood swings.  (Tr. 23–24.)  She was not sure if the mood swings
were attributable to her MS, or to a recent hysterectomy.  (Tr. 24.)  She had been prescribed
medication for her fatigue, but did not take it regularly because of its side effects.  (Tr. 24.)

Mr. Cools, the medical expert, testified that Claimant suffered from depression stemming
from her MS, as well as from family difficulties and chronic pain.  (Tr. 43.)  He believed that the
depression primarily limited her functioning in the area of concentration, persistence, and pace.
(Tr. 43–44.)  He also testified that Claimant's ability to engage in close relationships was
interfered with by the depression.  (Tr. 44.)  He felt that Claimant would be able to have "limited
contact, casual contact with the general public and to relate effectively to supervisors and
coworkers on a very casual basis."  (Tr. 44.)  Mr. Cools testified that the GAF score of 45 given
to Claimant by Dr. Rasmussen in 1999 was not consistent with the diagnosis of depression, and
probably reflected physical limitations too.  (Tr. 41.)  He could not tell whether Claimant's
fatigue was a result of the depression, the MS, or a combination of both.  (Tr. 43.)

## V.    Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the
proceeding for rehearing or hearing of additional evidence.  42 U.S.C. § 405(g).  The ALJ's legal
conclusions are reviewed de novo.  *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).
However, the court "may not decide the facts anew, reweigh the evidence or substitute its own
judgment for that of the [ALJ]."  *Id.*  The duties to weigh the evidence, resolve material conflicts,

make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI. Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the

following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VII.   Analysis

### A.   Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that Claimant "did not engage in substantial gainful activity during the period from December 28, 1996, her alleged onset date of disability, through March 31, 2002, her date last insured." (Tr. 61.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.   Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe

impairment.[5]  A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c).  If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that on or before the onset date and through her date last insured, Claimant had the following impairments: MS, myofascial pain, and depression.  Because these medically determinable conditions significantly limited Claimant's ability to perform basic work activity, the ALJ recognized these impairments as "severe impairments" under 20 C.F.R. § 404.1520(c).

Claimant argues that the ALJ erred in not naming Claimant's degenerative disc disease as a severe impairment in her Step Two analysis.  Claimant's argument is misplaced.  The inquiry at Step Two is only whether Claimant had one or more severe impairments such that the ALJ should proceed to Step Three.  In this case, the ALJ found that Claimant had one or more severe impairments at Step Two, and she then moved on to Step Three.  Because substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, the ALJ's Step Two determination is affirmed.

## C.     Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404,

---

[5] The claimant need not specify a single disabling impairment, as the Commissioner will consider combinations of impairments.  *See, e.g.*, 20 C.F.R. § 404.1520(c).  To simplify, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

subpt. P, app. 1.  The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity.  20 C.F.R. § 404.1525(a).  The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant's impairment did not meet or medically equal the level of severity contemplated for any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  The ALJ found that Claimant did not meet the listing for MS because she did not have sustained disorganization of motor function or reproducible fatigue with activity.  (Tr. 61.)  The ALJ also found that Claimant did not meet the listing for depression because, with respect to the "Paragraph B" criteria, the only limitation caused by the impairment was "a moderate one with respect to concentration, persistence and pace."  (Tr. 61.)  The ALJ found that there were no limitations across the functional areas of activities of daily living or maintaining social functioning, and no repeated episodes of decompensation.  Neither party disputes the ALJ's Step Three determination.  Claimant has not directed the court's attention to any listing that she may have met or medically equaled.  The ALJ's Step Three determination is affirmed.

**D.      Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work.  Residual functional

capacity is a measure of the abilities which the claimant retains despite his or her impairment.

20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence,

including objective medical evidence, treatment, physicians' opinions and observations, and the

claimant's own statements about her limitations. *Id.* Although medical opinions bear strongly

upon the determination of RFC, they are not conclusive; the determination is left to the

Commissioner who must resolve any discrepancies in the evidence and base a decision upon the

record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th

Cir. 1995).

When evaluating mental impairments, the Commissioner must use the special technique.

20 C.F.R. § 404.1520a. Under the special technique, the Commissioner determines the degree of

a claimant's functional limit by rating

> the degree of limitation in the first three functional areas (activities of daily living;
> social functioning; and concentration, persistence, or pace) [using] the following
> five-point scale: None, mild, moderate, marked, and extreme. When [the
> Commissioner rates] the degree of limitation in the fourth functional area (episodes
> of decompensation), [the Commissioner uses] the following four point scale: None,
> one or two, three, four or more.

20 C.F.R. § 404.1520a(c). These determinations are used when assessing the severity of a

claimant's impairment and when determining a claimant's RFC. 20 C.F.R. § 404.1520a(d)(3);

*Burke v. Astrue*, 306 Fed. Appx. 312, 314–15 (7th Cir. 2009).

When assessing the credibility of a claimant's statements about his or her symptoms,

including pain, the ALJ should consider the following in addition to the objective medical

evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity

of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the

symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the

claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows her to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ found that Claimant's RFC enabled her "to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she could walk no more than occasionally but could stand frequently if allowed to change position." (Tr. 62.) The ALJ also assessed Claimant's RFC to include a limitation whereby Claimant could not use her hands more than frequently. (Tr. 62.) The ALJ's RFC determination also limited Claimant to unskilled work because of her problems with relationships, and specifically her problems interacting with coworkers, supervisors, and the public. (Tr. 64, 65.)

In making her RFC determination, the ALJ considered Claimant's testimony regarding her limitations prior to her date last insured. The ALJ noted Claimant's testimony that she experienced pain in her hands, shoulders, feet and legs, and had difficulty with stiffness in her legs before she quit work. (Tr. 62.) The ALJ also noted Claimant's and Ms. Rich's testimonies regarding the trouble Claimant had caring for Ms. Rich when Ms. Rich was on bed rest. Both

women testified that Claimant was fatigued at the time.  (Tr. 62–63.)  Ms. Rich testified that Claimant would drive to Ms. Rich's home in March 2002 to try to help her, that her mother walked stiff legged, and that she could not stand for prolonged periods of time.  (Tr. 63.)

The ALJ relied on Claimant's testimony that since 2002 she could stand for 15 minutes before her back hurt and her legs gave out.  (Tr. 63.)  The ALJ also noted Claimant's testimony regarding the change in her daily activities since the 2005 exacerbation.  The ALJ noted Claimant's testimony that she began using her cane in 2005, and started taking medication for her mood swings in 2005.  (Tr. 62.)  Claimant also testified that, prior to 2005, she cooked more meals, made pies, decorated cakes, read books, and used to go to the fitness center.  (Tr. 62.)

The ALJ started her review of Claimant's medical evidence with the 1997 reports from the Freeport Clinic.  (Tr. 63.)  Those documents indicate a numbness and tingling in Claimant's lower extremities, and that Claimant had difficulty walking and felt unsteady.  (Tr. 63.)

The ALJ next considered the 1999 Mayo Clinic evidence.  The ALJ noted that Claimant went to the Mayo Clinic because of pain in her neck, head, back and legs.  (Tr. 63.)  The ALJ relied on Dr. Daube's report from December 3, 1999 which stated that he saw no evidence of active MS, but that he observed an MRI dated April 1, 1997 that was suggestive of MS.  (Tr. 63.) The ALJ also considered Dr. Oh's Mayo Clinic report stating that Claimant had multifactorial myofascial pain syndrome complicated by psychosocial issues and deconditioning, and that a chronic pain program was recommended.  (Tr. 63.)

The ALJ accounted for Dr. Rasmussen's 1999 observations that Claimant had anhedonia, crying spells, suicidal ideation, difficulty concentrating, fatigue, and increased appetite.  (Tr. 63.) Dr. Rasmussen's report noted that pain was Claimant's main stressor, and that if her pain was

gone, then her depression would be a lot less. (Tr. 63.) The ALJ noted that Dr. Rasmussen's mental status examination found Claimant alert, oriented, and exhibiting no psychomotor disturbance. (Tr. 63.) The ALJ also took note that Dr. Rasmussen diagnosed Claimant as having chronic moderate depression, and prescribed Serzone. (Tr. 63.)

The ALJ acknowledged the January 2002 Monroe Clinic report that described leg and foot numbness, with a positive Babinski sign exhibited by Claimant's right leg. (Tr. 63.) It was suggested to Claimant at that time that MS may be a possible diagnosis. (Tr. 63.)

The ALJ then described the 2005 exacerbation. In response to the exacerbation, Claimant went back to the Mayo Clinic. The ALJ noted that tests from the Mayo Clinic at that time were consistent with myelopathy and that a spinal tap confirmed diagnosis of MS. (Tr. 64.) Upon diagnosis of MS, Claimant began taking Methotrexate. (Tr. 64.) When Claimant returned to the Mayo Clinic on July 11, 2005 complaining of imbalance, numbness, and spasticity, the ALJ observed, an MRI revealed multiple T2 hyperintense lesions and a possible diagnosis of MS. (Tr. 64.)

Regarding Claimant's mental limitations, the ALJ wrote that the record was sparse. She further wrote, "The medical expert testimony that even though the claimant described some difficulty with concentration, she would have been able to do unskilled work tasks is accepted." The ALJ evaluated Claimant across the four functional domains, as required by the special technique, in her Step Three analysis.

The ALJ found that Claimant's medical history suggested discrete episodes of MS that resolved prior to March 31, 2002, and wrote that there was no evidence of any problem that persisted. (Tr. 64.) She noted that some of Claimant's complaints did not emerge until after the

2005 exacerbation. (Tr. 64.) The ALJ found important that although Claimant and her daughter testified about Claimant's fatigue during Ms. Ross's period of bed rest, the medical records dated February 2002 do not mention fatigue at all. (Tr. 64.) Also, until the 2005 exacerbation, Claimant "handled an array of activities and had an exercise program that included walking." (Tr. 64.) The ALJ wrote that the leg limitations in Claimant's RFC were greater than those expressed in the medical records. (Tr. 64.) The ALJ also included a limitation in Claimant's RFC regarding the use of her hands, even though the ALJ did not think that evidence supported the existence of a hand limitation prior to carpal tunnel surgery in 2005. (Tr. 64.)

The ALJ failed to mention in her opinion a number of doctors' reports. The ALJ did not mention any doctor report dated prior to June 1997. Claimant's medical history prior to June 1997 includes reports from Dr. Donovan at Rockford Memorial Hospital, Dr. Maynard at the Monroe Clinic, and Dr. Shah, a neurologist. These reports document Claimant's first complaints of leg numbness and tingling, as well as leg pain. (Tr. 500, 503, 520, 522.) They also describe Claimant as feeling tired, and as having trouble sleeping. (Tr. 501.) Dr. Donovan prescribed Claimant an antidepressant in November 1996, and Dr. Shah made the first diagnosis of possible MS in April 1997. (Tr. 501, 503.)

The ALJ used one sentence to mention Dr. Srivastava's June 1997 report, and neglected to mention any of Dr. Srivastava's reports dated July 1997 through September 1997. During the course of those treatments, Claimant's condition improved somewhat, but she still reported feeling tired. (Tr. 300–04.) The ALJ did not account for Dr. Singh's report, which confirmed diminished vibration sense in the legs, and some difficulty doing neck and heel to toe movements. (Tr. 304–05.)

The ALJ did not mention the March 2000 report of Ms. Blair from the Freeport Health Network, which indicated that Paxil had been helping Claimant's depression. (Tr. 349.) The ALJ also failed to cite Dr. Woiteshek's report which documented that Claimant was still experiencing leg pain and numbness. (Tr. 308, 311.) Dr. Woiteshek's report also indicated that Cortisone injections and Celebrex helped. (Tr. 310–12.)

Despite having failed to account for these relevant doctors' reports, the ALJ's RFC determination is still based on substantial evidence in the record. The ALJ considered Claimant's and Ms. Rich's testimonies regarding Claimant's limitations in daily activities during the relevant time period. She also relied on a sufficient amount of medical records relating to Claimant's physical limitations dating prior to March 31, 2002, including records from the Freeport Clinic, the Mayo Clinic, and the Monroe Clinic.

The objective evidence missing from the ALJ's analysis mainly reiterates and is somewhat duplicative of the medical evidence relied on by the ALJ to make her RFC determination. Considering all the medical evidence in the record, Claimant's medical history shows a pattern of numbness and pain in the lower extremities. This evidence supports the ALJ's determination that Claimant could stand frequently if she was allowed to change position and could walk only occasionally. No evidence suggests limitations greater than those expressed in the ALJ's RFC determination.

It seems that Claimant's limitations increased after the 2005 exacerbation, but that time period was after Claimant's date last insured. Although evidence after March 31, 2002, including evidence of the 2005 exacerbation, indicates that Claimant may have had MS prior to her date last insured, there is no evidence that her physical limitations caused by the condition

were greater than those expressed in the RFC.

The ALJ did not discuss Claimant's diagnosed depression much, or the medications she was prescribed to treat it. But, the ALJ accounted for Claimant's mental limitations by rating Claimant across the four functional areas required under the special technique, and finding that the only area for which Claimant showed limitations was the concentration, persistence, and pace area. The ALJ relied on the testimony of Mr. Cools to find only a moderate limitation in the area of concentration, persistence, and pace. Claimant's limitation, Dr. Cools testified, would impede her ability to interact with coworkers, supervisors, and the public. (Tr. 44.) The ALJ accepted this limitation when she held that Claimant could only perform unskilled work. (Tr. 64, 65.) The ALJ's RFC determination reflects that limitation.

The ALJ considered the majority of the report issued by Dr. Rasmussen in 1997, but did not discuss the low GAF score. GAF scores are helpful in determining a claimant's level of functioning. They are a numerical expression of the physician's overall assessment of a claimant's psychological, social, and occupational limitations. *Stedmans*, *supra* note 1. The ALJ did not discuss the GAF score, but she did consider evidence on which the GAF score is supposedly based. The ALJ sufficiently considered the evidence in the record to find that Claimant's only mental limitation was moderate in the functional area of concentration, persistence, and pace.

The ALJ found that Claimant's and Ms. Rich's testimonies regarding Claimant's fatigue in February 2002 had little credibility because the medical records from February 2002 did not corroborate the testimony. The court finds this credibility analysis suspect. Reports from Dr. Maynard in 1995, Dr. Srivastava in 1997, and Dr. Singh in 1997 all indicate that Claimant felt

22

tired or fatigued.  (Tr. 300, 304, 522.)  Claimant testified that she has felt tired for the past ten

years.  (Tr. 15.)  This evidence suggests that Claimant might have been fatigued in 2002.

Regardless, evidence of Claimant's fatigue taken with other medical evidence and her testimony

regarding her daily activities supports the ALJ's finding that the intensity, persistence, and

limiting effects are less than those suggested by Claimant.  There is nothing in the record to

suggest limitations greater than those in the ALJ's RFC determination.

Because the ALJ's RFC determination is based on substantial evidence in the record, and

because the ALJ created a logical bridge from the evidence in the record to her RFC

determination, the court affirms the ALJ's RFC determination.  The ALJ found that through the

date last insured, Claimant was unable to perform her past relevant work, which required

constant use of her hands.  (Tr. 65.)  Neither party disputes this determination, and the court

affirms the ALJ's Step Four determination.

**E.      Step Five: Does Any Other Work Exist  in Significant Numbers in the National
         Economy Which Accommodates the Claimant's Residual Functional Capacity and
         Vocational Factors?**

At step five, the Commissioner determines whether the claimant's RFC and vocational

factors allow the claimant to perform any job which exists in the national economy in significant

numbers.  20 C.F.R. § 404.1560(c).  The burden is on the Commissioner to provide evidence that

demonstrates that other work exists.  20 C.F.R. § 404.1560(c)(2).  In determining whether other

work exists, the Commissioner considers the claimant's RFC and vocational factors in

conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, subpt. P, app. 2 (the

"Guidelines").  The Guidelines direct a conclusion of "disabled" or "not disabled" upon a

finding of a specific vocational profile.  Soc. Sec. Rul. 83-11.  The Guidelines represent

exertional maximums, though, and if the claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines, a conclusion cannot be directed without first considering the additional exertional limitations. Soc. Sec. Rul. 83-11 & 83-12. A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy. *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).

Because Claimant's exertional capacity was limited below the level contemplated by the Guidelines, the ALJ relied on a vocational expert. (Tr. 65.) The vocational expert in this case found that a person with Claimant's age, education, work experience, and RFC could perform the requirements of some assembly occupations, of which 3,000 jobs exist in the Chicago metropolitan area, some packer occupations, of which 1,000 jobs exist, and the occupation of machine operator, of which 1,000 jobs exist. A sufficient number of jobs exist in the regional economy which Claimant would have done through her date last insured. The court affirms the ALJ's decision.

## VIII.   Conclusion

For the forgoing reasons, the Commissioner's motion for summary judgment is granted and Claimant's motion for summary judgment is denied.

**E N T E R:**

_____

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: November 9, 2009